[No. G028732. Fourth Dist., Div. Three. May 31, 2002.]

JOHN BAKER, Plaintiff and Appellant, v.
STEVEN GOURLEY, as Director, etc., Defendant and Respondent.

**COUNSEL**

Law Offices of Barry Simons and Barry T. Simons for Plaintiff and Appellant.

Bill Lockyer, Attorney General, Laura Lee Gold and Dana T. Cartozian, Deputy Attorneys General, for Defendant and Respondent.

**OPINION**

**SILLS, P. J.**—This case centers on the so-called "Admin Per Se" laws where the Department of Motor Vehicles (DMV) suspends a driver's license when a motorist has been arrested for drunk driving *before* the motorist has had the benefit of a trial in a court of law. It does *not* involve a criminal prosecution for drunk driving. As we explain below, because the Admin Per Se law operates in a summary fashion, the DMV is required to show that the motorist had a certain amount of blood alcohol (.08 percent) at the time he or she was driving. And that requires a valid chemical test.

Of course, a jury in a court of law could certainly conclude in a criminal prosecution that a driver was intoxicated based on such indicia as slurred speech and an unsteady gait without a valid chemical test. And trial judges, even in a case of a first offense, have always had the power to suspend a driver's license as a condition of probation (see Veh. Code, § 13352). But before the DMV can summarily suspend a license *without court proceedings* it must have the definite evidence of a valid chemical test showing blood alcohol while driving of at least .08 percent. As the DMV itself is well aware, some symptoms of intoxication can occur *below* the .08 percent blood-alcohol threshold. The Legislature, however, has not authorized administrative suspension without substantial evidence the motorist was driving with at least that amount of alcohol in his or her blood.

## Background

John Baker was arrested for drunk driving and had his driver's license suspended. He challenged the suspension in an administrative hearing conducted by the DMV. At the hearing Baker presented uncontroverted evidence that the Orange County crime lab which analyzed his blood sample had not complied with state regulations requiring such labs to have new alcohol testing procedures on file with the State Department of Health Services.[1] The new procedures used by the lab involved a larger glass vial and more sodium fluoride as a preservative. At the administrative hearing, there was uncontroverted expert testimony to the effect that the combination could result in a false high. The DMV did nothing to show that the test was otherwise reliable. Even so, the DMV refused to reinstate Baker's license.

Baker then sought relief in the trial court. He brought a petition for a writ of mandate, seeking an order requiring the reinstatement of the license. The petition was denied by the trial judge, based on circumstantial evidence *other than the suspect blood test.* Specifically, at the time of his arrest Baker had exhibited an unsteady gait, bloodshot eyes, slurred speech, a smell of alcohol, and there was a port wine stain on his clothing.

This non-chemical test evidence is important because, given the crime lab's failure to comply with the state regulations, the burden then shifted to the DMV to show that the test was *still* reliable. (See *Davenport v. Department of Motor Vehicles* (1992) 6 Cal.App.4th 133, 144 [7 Cal.Rptr.2d 818] ["If the licensee shows . . . that official standards were in any respect not observed, the burden shifts to the [DMV] to prove that the test was reliable despite the violation."].) Having failed to carry that burden, the upshot is that the DMV had no substantial evidence with which to conclude that Baker's blood-alcohol level was .08 percent or greater at a time while he was driving.

That is, unless the unsteady gait, the bloodshot eyes, the slurred speech, the odor of alcohol and the wine stain could, *by themselves*, suffice to establish that Baker had .08 or greater blood alcohol while he was driving.

■ The case thus quickly devolves to this question: Can a given amount of blood-alcohol level be established *without a valid chemical test* by evidence of behavior or indicia typically *associated* with intoxication, such as,

---

[1]Section 1220 of title 17 of the California Code of Regulations states in pertinent part, "(a) All laboratory methods used for forensic alcohol analysis shall be subject to standards set forth in this Article. [¶] (b) Each licensed forensic alcohol laboratory shall have on file with the Department [of Health Services] detailed, up-to-date written descriptions of each method it uses for forensic alcohol analysis." It is not clear whether this regulation impliedly requires *approval* of any new testing procedures, but that issue is outside the purview of this opinion.

like here, slurred speech, bloodshot eyes, or an unsteady gait? The DMV claims that *McKinney v. Department of Motor Vehicles* (1992) 5 Cal.App.4th 519 [7 Cal.Rptr.2d 18] and *Jackson v. Department of Motor Vehicles* (1994) 22 Cal.App.4th 730 [27 Cal.Rptr.2d 712] provide an affirmative answer to the question.

No. They don't. There is language in both cases which can be read for the proposition that circumstantial evidence apart from a chemical test might establish a given blood-alcohol level, but that language is not only dicta, but unsupported dicta. In the *Jackson* case, in fact, one of the authorities cited by the court would require the opposite conclusion.

### *McKinney*

The *McKinney* case arose out of the "sloppy draftsmanship" of a DMV form used by arresting officers. (See *McKinney v. Department of Motor Vehicles, supra,* 5 Cal.App.4th at p. 523.) The form merely asked the officer to say that at such and such a date and time, he or she "had reasonable cause to believe" that a certain driver "was arrested" for driving under the influence. (*Ibid.*) The court noted that by focusing on the time of the *arrest,* the form omitted any material as to the time the motorist was *driving* under the influence. As the *McKinney* court pointed out, the form was illogical: An arresting officer certainly *knows* when he or she made the arrest. (See *ibid.*) What the form *should* have asked the officer to state is that at such and such a time, the officer had "reasonable cause to believe the driver was *driving* under the influence of alcohol." (*Id.* at p. 524, italics omitted.)

Seizing on the deficiency of the form, the arrested motorist in *McKinney* argued that there was no evidence that his blood-alcohol level was .08 at the time he was *driving,* even though a subsequent chemical test, an Intoxilyzer, conducted less than an hour and one-half later, showed two blood-alcohol readings of .128 and .129. (*McKinney v. Department of Motor Vehicles, supra,* 5 Cal.App.4th at pp. 521-522.)

Most of the opinion was taken up establishing the point that the DMV hearing officer could validly *infer* from the motorist's condition at the time of his *arrest* that he had more than .08 alcohol in his blood at the time he was *driving.* (See *McKinney v. Department of Motor Vehicles, supra,* 5 Cal.App.4th at pp. 523-524.) The second part of the opinion tackled the issue of whether the DMV had the burden of establishing the admissibility of the chemical test under the "Kelly-Frye" standard. (See *id.* at p. 525.)

The passage which supports the DMV's position here is found in the third part of the opinion in the last substantive paragraph. (See *McKinney v.*

*Department of Motor Vehicles, supra,* 5 Cal.App.4th at p. 526.) There, the court noted that one of the elements necessary for the suspension of the license is that the motorist's blood-alcohol level be at least .08. The court then declared, without further analysis, that the element was "abundantly established, both by the breathalyzer test readings and the arresting officer's personal observations." (*Ibid.*)

The declaration would be have nothing more than an ipse dixit had the court not appended to it a three-paragraph footnote. The footnote began with this one-sentence paragraph: "While a chemical test result is usually relied upon by the hearing officer as decisive, we point out that it is not the only means of establishing that a driver's BAL was .08 or more." (*McKinney v. Department of Motor Vehicles, supra,* 5 Cal.App.4th at p. 526, fn. 6.)

Next followed this sentence, impliedly offered as support for the preceding sentence: "As our Supreme Court has noted, what the Legislature has prohibited is *driving* a vehicle with a blood-alcohol rate over the prescribed limit, not driving when a *chemical test* shows it to be over the limit." (*McKinney v. Department of Motor Vehicles, supra,* 5 Cal.App.4th at p. 526, fn. 6, original italics.) That statement, of course, is otherwise unremarkable.

The next sentence, however, then leapt to this conclusion: "Thus, both parties are free to introduce circumstantial evidence bearing on whether the driver's BAL exceeded the permissible level." (*McKinney v. Department of Motor Vehicles, supra,* 5 Cal.App.4th at p. 526, fn. 6.) For this statement the *McKinney* court cited *Burg v. Municipal Court* (1983) 35 Cal.3d 257, 266, footnote 10 [198 Cal.Rptr. 145, 673 P.2d 732].

*Burg* was a Supreme Court tour de force opinion written in response to a challenge to California's having adopted the " 'Scandinavian model' " of drunk driving law. (See *Burg v. Municipal Court, supra,* 35 Cal.3d at p. 263.) California had recently defined its penal drunk driving law in terms of having a certain blood-alcohol level and the defendant in *Burg* argued that the law was unconstitutionally vague. His theory was that a motorist usually cannot know *precisely* how much alcohol is in his or her blood. (See *id.* at p. 261.)

The *Burg* court, of course, rejected the defendant's void-for-vagueness idea. Footnote 10 in *Burg*, relied on by the *McKinney* court, was itself the tag end of a passage the gravamen of which was a refutation of the defendant's contention that the state had unconstitutionally created a presumption of guilt. (See *Burg v. Municipal Court, supra,* 35 Cal.3d at pp. 264-266.) The *Burg* court refuted the contention by saying, in the text, that the prosecution

still had to prove, at the time a motorist was driving, his or her blood alcohol exceeded the defined amount. (*Id.* at p. 265.) Footnote 10 was appended after that comment. (*Burg, supra,* 35 Cal.3d at pp. 265-266, & p. 266, fn. 10.)

*Burg v. Municipal Court, supra,* 35 Cal.3d at page 266, footnote 10 opened with the point, noted above, that what the law actually prohibits is driving with blood alcohol at or above a certain point, not driving "when a subsequent test shows a level of 0.10 or more."

Then came the sentence that the *McKinney* court presumably relied on for the proposition that "both parties are free to introduce circumstantial evidence bearing on whether the driver's BAL exceeded the permissible level." It read: "Circumstantial evidence will generally be necessary to establish the requisite blood-alcohol level called for by the statute." (*Burg v. Municipal Court, supra,* 35 Cal.3d at p. 266, fn. 10.)

However, the "circumstantial evidence" that the court was referring to clearly contemplated chemical tests as well as other evidence. The *Burg* court's next sentence was: "A test for the proportion of alcohol in the blood will, obviously, be the usual type of circumstantial evidence, but of course the test is not conclusive: the *defendant* remains *free to challenge the accuracy of the test result,* the manner in which it was administered, and by whom. [Citations.]" (*Burg v. Municipal Court, supra,* 35 Cal.3d at p. 266, fn. 10, italics added.) The paragraph ended with a sentence that emphasized the relationship between chemical test evidence and non-chemical test evidence: "Of course, both parties may also adduce *other* circumstantial evidence tending to establish that the defendant did or did not have a 0.10 percent blood-alcohol level while driving." (*Ibid.,* italics added.)

*That* sentence, in turn, was supported by a citation to *Fuenning v. Superior Court* (1983) 139 Ariz. 590 [680 P.2d 121, 130]. The passage from *Fuenning* to which the *Burg* court referred was, however, *not* a discussion of whether non-chemical test circumstantial evidence could establish a given blood-alcohol level. Rather, the defendant in *Fuenning* had argued that such circumstantial evidence was *totally irrelevant* to a determination of blood-alcohol level. The *Fuenning* court was determined to debunk that idea.

In that context, the *Fuenning* court had this to say (which it said in the main text, not a footnote): "In each case in which a violation of [the subsection of the statute precluding driving with .10 blood alcohol] is charged, *the state will present evidence of the test* and the issue will be whether the test results were an accurate measurement of the defendant's BAC at the time of arrest. Typically, defendants will attack the margin of

error, the conversion rate, the calibration of the test instrument, the technique used by the operator, the absorption and detoxification factors, etc. Evidence of the defendant's conduct and behavior—good or bad—will be relevant to the jury's determination of *whether the test results are an accurate measurement* of alcohol concentration at the time of the conduct charged." (*Fuenning v. Superior Court, supra,* 680 P.2d at p. 130, italics added.)

In short, *Fuenning*'s discussion was predicated on the existence of a chemical test. The court simply rebutted the notion that the trier of fact should be *limited* to the test.

Three conclusions necessarily emerge from our exploration of *McKinney,* its explanatory footnote, the authorities mentioned in that footnote, and the authorities cited by those authorities. The first is that the *McKinney* court never actually *held* that circumstantial evidence *absent* a chemical test of some sort was sufficient to establish a given blood-alcohol level. The court was, strictly speaking, only concerned with the question of whether nonchemical test circumstantial evidence might be used to establish the perfectly commonsense notion that if a driver had X amount of alcohol in his blood at the time of his arrest, the driver also had X amount of alcohol when he was driving.[2]

The next conclusion is that anything that the *McKinney* court said or implied about the establishment of blood-alcohol level in the absence of a chemical test was unnecessary to the result, i.e., dicta. The *McKinney* court needed only to have addressed whether such evidence could *corroborate* a chemical test (which is an easy question—the answer to that is obviously yes).

The third conclusion is that any dicta in *McKinney* concerning the establishment of blood-alcohol level in the absence of a chemical test (e.g., that a chemical test "is not the only means of establishing that a driver's BAL was .08 or more") was unsupported by the authorities it cited. It is reasonably clear from both *Burg* and *Fuenning* that their concern was also the obvious need to use non-chemical test circumstantial evidence to corroborate or bolster the accuracy of a chemical test. Neither case purported to hold or say anything to the effect that a given blood-alcohol level could be established *merely* on the basis of circumstantial evidence *without* a valid blood test.

---

[2] A corollary to this commonsense point is that non-chemical test circumstantial evidence can shed light on whether the margin of error *in* a chemical test makes any difference. (See *People v. Randolph* (1989) 213 Cal.App.3d Supp. 1, 5-8 [262 Cal.Rptr. 378] (such evidence was available to refute idea that a test reading of .10, when that was the limit, did not show actual .10 blood alcohol given a margin of error of 0.010 percent).)

The language in *McKinney* which might be read for the idea that non-chemical test evidence alone will suffice is an example of the tendency of ideas to become distorted when they are paraphrased from one court to another. As we said in *In re Marriage of Schaffer* (1999) 69 Cal.App.4th 801, 811, footnote 7 [81 Cal.Rptr.2d 797]: "Judges must always be aware of the tendency of the common law to be like the child's birthday game where a few words are whispered into the ear of one person who then repeats them to the next and so on until the words have made their way round the table and it is finally discovered that they have been mangled beyond all recognition." *McKinney* didn't exactly mangle *Burg* and *Fuenning*, but loose language in the opinion would impliedly extract from those cases a proposition that wasn't in them.

*Jackson*

Seventeen volumes of the Official California Appellate Reports, Fourth Series after *McKinney*, another division of the Court of Appeal handed down *Jackson v. Department of Motor Vehicles, supra*, 22 Cal.App.4th 730, which also contained a statement which might be read for the idea that circumstantial evidence sans chemical test could suffice to establish a proscribed blood-alcohol level.

The *Jackson* case followed much the same pattern as *McKinney*. That is, the motorist asserted there was insufficient evidence his blood level was .08 or greater *at the time he was driving*. (See *Jackson v. Department of Motor Vehicles, supra*, 22 Cal.App.4th at pp. 740-741.) The contention was based on a one-and-three-quarter-hour time lapse between the *report* of the accident leading to the arrest (ironically, the motorist wasn't at fault—*he* had been rear-ended at a stoplight) and the actual administration of a breath test yielding a .08 reading.

Given the additional, non-chemical test evidence of intoxication—bloodshot watery eyes, slurred speech, odor of alcohol, unsteady gait—the contention, said the court, was nonsense. (See *Jackson v. Department of Motor Vehicles, supra*, 22 Cal.App.4th at p. 741.)

Again, the court relied on the reasonable inferences to be drawn. The test was performed less than two hours after the accident had been reported, there was nothing to indicate that more than one hour had elapsed from the actual time of the accident to the report of it, and therefore the statutory presumption that a chemical test administered within three hours "after the driving" shows the blood alcohol at the time of driving (see Veh. Code, § 23152, subd. (b)) had gone unrebutted, and it had therefore been established that the blood alcohol *at the time of driving* was .08 or greater. (*Jackson v. Department of Motor Vehicles, supra*, 22 Cal.App.4th at p. 741.)

Then, as in *McKinney*, came some dicta to bolster the conclusion. "We also note," said the *Jackson* court, "circumstantial evidence other than chemical test results may properly be admitted to establish a driver had the proscribed level of blood-alcohol at the time of the offense." (*Jackson v. Department of Motor Vehicles, supra*, 22 Cal.App.4th at p. 741.) For that proposition, the *Jackson* court cited footnotes in three authorities: footnote 10 in *Burg*, which we have already discussed, footnote 6 in *McKinney*, which we have also already discussed, and footnote 7 in *Imachi v. Department of Motor Vehicles* (1992) 2 Cal.App.4th 809, 817 [3 Cal.Rptr.2d 478].

*Imachi*, ironically enough, not only didn't support the proposition for which it was cited, it went in the opposite direction. In *Imachi*, the breath test itself showed only a .07 reading. (See *Imachi v. Department of Motor Vehicles, supra*, 2 Cal.App.4th at p. 813.) There was no evidence that the motorist had .08 alcohol or more in his blood, except for an officer's supplemental declaration "which reported test results showing a blood-alcohol concentration of .08 percent." (*Id.* at p. 812.)

That wasn't enough, said the *Imachi* court. (See *Imachi v. Department of Motor Vehicles, supra*, 2 Cal.App.4th at p. 817 ["The problem in the present case is that the blood test results were put in evidence only through the hearsay statement of the officer."].) In the text the court ruled: The "hearsay within the statement *could not be the sole basis* for the suspension of the appellant's driver's license." (*Ibid.*, italics added.)

It was its rejection of the officer's hearsay as the "sole basis" for suspension to which the *Imachi* court appended footnote 7, which the *Jackson* court in turn cited for the proposition that "circumstantial evidence other than chemical test results may properly be admitted to establish a driver had the proscribed level of blood-alcohol at the time of the offense." (*Jackson v. Department of Motor Vehicles, supra*, 22 Cal.App.4th at p. 741.)

But *Imachi* footnote 7 said no such thing. It began with this sentence: "*Respondent* [the DMV] *notes* that circumstantial evidence other than chemical test results is admissible to establish that a driver had the proscribed level of blood alcohol at the time of the offense," and then cited the same footnote 10 in *Burg* cited by *McKinney*. (*Imachi v. Department of Motor Vehicles, supra*, 2 Cal.App.4th at p. 817, fn. 7.)

Obviously that sentence doesn't help the DMV's position here. Every first-week law student should be taught that restatements of assertions by litigants within an opinion do not represent the deliberative process of the court.

*Imachi* footnote 7 next described the officer's statement to the effect the motorist had exhibited the usual symptoms (unsteady gait, watery eyes

etcetera). The court then juxtaposed the officer's statement with the next sentence, to the effect that the DMV was *not* contending the disputed blood test was admissible on the theory that it was "only used 'for the purpose of supplementing or explaining other evidence.' " The appellate court next stated: "Where, as here, an objective test scientifically establishing the proscribed blood-alcohol level is improperly considered, an appellate court cannot assume the trial court did not rely solely upon it." Given the statute precluding "sole reliance on hearsay evidence" (i.e., Gov. Code, § 11513) and "the fact that the test result was clearly the critical piece of evidence establishing that appellant's blood-alcohol concentration exceeded the legal limit, no such contention would be persuasive." (*Imachi v. Department of Motor Vehicles, supra,* 2 Cal.App.4th at p. 817, fn. 7.)

While *Imachi*'s footnote 7 is perhaps not the easiest legal writing to follow, basically it made the point that *if* the DMV had argued that reliance on the officer's statement was permissible to show .08 blood alcohol, it would have lost.

The same conclusions emerge from our analysis of *Jackson* that emerged from our analysis of *McKinney*. First, *Jackson*'s statement that "circumstantial evidence other than chemical test results may properly be admitted to establish a driver had the proscribed level of blood-alcohol at the time of the offense," (*Jackson v. Department of Motor Vehicles, supra,* 22 Cal.App.4th at p. 741) was not as tightly written as the court might have wanted: The *Jackson* court was focused, like the *McKinney* court, on the question of whether a blood-alcohol test administered sometime after arrest could properly show a given blood-alcohol level while driving. (*Of course* non-chemical test evidence is available on that point, because it is a reasonable inference that a driver who is acting drunk at the time of arrest has a *higher* blood alcohol *at that time* than at the time of the actual administration of the chemical test.)

Second, to the degree that the statement *is* construed to mean that nonchemical test evidence can *alone* support a blood-alcohol concentration, it was dicta. *Jackson* was never required to confront that question.

Third, to the degree that the statement is construed to mean that non-chemical test evidence can *alone* support a blood-alcohol concentration, it was unsupported dicta. The citation to the *McKinney* footnote was only as strong as the *McKinney* footnote itself, the *Burg* footnote did not say that at all, and the *Imachi* footnote actually went in the opposite direction.

### Thinking Through the Problem

Neither *McKinney* nor *Jackson* directly confronted the problem of whether circumstantial evidence *without a valid chemical test* could support a finding

that a motorist was driving with a given alcohol level. *Imachi* came the closest to directly addressing the issue, because the case involved no valid chemical test, only an officer's hearsay statement of what he thought the test result was. Most telling there, the motorist won.

Here, Baker's license was suspended under the so-called Admin Per Se law (Veh. Code, § 13353.2), and the whole point of that law is the "per se" part. It is focused *entirely* on blood-alcohol level. Section 13353.2, subdivision (a) provides: "The department shall immediately suspend the privilege of any person to operate a motor vehicle for any one of the following reasons" and then follow only two reasons: "(1) The person was driving a motor vehicle when the person had 0.08 percent or more, by weight, of alcohol in his or her blood," and "(2) The person was under 21 years of age and had a blood-alcohol concentration of 0.01 percent or greater, as measured by a preliminary alcohol screening test, or other chemical test." Missing among the listed reasons is substantive intoxication, independent of blood-alcohol level, as is provided for in the *criminal* drunk driving laws. (Cf. Veh. Code, § 23152, subd. (a) ["It is unlawful for any person who is under the influence of any alcoholic beverage or drug, or under the combined influence of any alcoholic beverage and drug, to drive a vehicle."].)

Because the Admin Per Se law is wholly pegged to a given blood-alcohol level, it follows that circumstantial evidence *without* a valid chemical test is insufficient to suspend a license. After all, the usual symptoms of substantive intoxication—slurred speech, bloodshot eyes, etcetera—can manifest themselves at a blood-alcohol level *below* .08. (See *Burg v. Department of Motor Vehicles, supra,* 35 Cal.3d at pp. 267-268 [noting that vision and reaction time impairments can occur below a .08 blood-alcohol level].) We are aware of no body of scientific evidence to the effect that such symptoms as slurred speech, bloodshot eyes, or even port wine stains, *automatically* correlate with .08 or greater blood alcohol. In fact, as contact lens wearers know, bloodshot eyes may have nothing to do with drinking. Thus to allow such symptoms to establish a blood-alcohol level without a valid chemical test is to add to the Admin Per Se statute what isn't there. (See Code Civ. Proc., § 1859 [judges are not to add or subtract to statutes].)

The trial court therefore erred in concluding the DMV had sufficient evidence to suspend Baker's license based only on the evidence of substantive intoxication in the face of the department's failure to carry its burden of demonstrating that the blood test was reliable.

The judgment of the trial court in denying the requested writ of mandate is therefore reversed, with directions to enter a new order granting the requested writ. Baker shall also recover his costs on appeal.

Given that there was evidence of substantive intoxication, however, it would be unseemly, as we have concluded in similar cases, to sanction the DMV for presenting a frivolous defense. Any reasonable attorney could easily have gotten lost in the labyrinth of footnotes concealed within the *McKinney* and *Jackson* dicta.

O'Leary, J., and Aronson, J., concurred.

Respondent's petition for review by the Supreme Court was denied August 14, 2002.